**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **TAVISH JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 5480** |
| | ) | |
| **RAVIEL B. WINTERS, CHRISTOPHER ROSS,** | ) | **Judge Rebecca R. Pallmeyer** |
| **CHRISTOPHER M. GORE, ROBERT X.** | ) | |
| **REIGHTER, and PHILIP J. MICHEL,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Tavish Johnson, a state prisoner, claims that a correctional officer sexually harassed him while he was incarcerated at Stateville Correctional Center ("Stateville") and then retaliated against him, along with other officers, for his efforts to file a grievance. Johnson has filed this action pursuant to 42 U.S.C. § 1983 against four Stateville officers; he also asserts supplemental claims under Illinois state law. Defendants seek summary judgment on all claims, and Plaintiff moves for partial summary judgment on the retaliation claim. For the reasons explained here, Defendants' motion [53] is granted in part and denied in part, and Plaintiff's motion [57] is denied.

## BACKGROUND

Johnson was incarcerated at Stateville, part of the Illinois Department of Corrections ("IDOC"), at all times relevant to this action. (Pl.'s 56.1 [59] ¶¶ 1-2, 40.) Defendants Raviel Winters and Robert Reighter were correctional officers at Stateville. Defendants Philip Michel and Christopher Ross were lieutenants, who supervise the correctional officers. (Defs.' 56.1 [55] ¶¶ 2-5; Ross Dep. [60-1], Ex. 3 to Buishas Aff. in Supp. of Pl.'s Mot. for Part. Summ. J., hereinafter "Buishas Aff.", at 34:12-17.)

## I.    Comments Made by Officer Winters in the Showers

On September 7, 2009, Officer Winters was assigned to supervise the inmate showers in

the unit where Plaintiff was housed.  (Pl.'s 56.1 ¶ 9.)  The two single-person showers in the unit have bars for a door and stand adjacent to each other, separated by a wall.  (Johnson Dep. [60-3], Ex. 6 to Buishas Aff., at 10:10-11:20.)  Plaintiff claims that Officer Winters made sexually suggestive remarks about Plaintiff's buttocks to him while he was showering.  (Pl.'s 56.1 ¶ 10.)  According to Plaintiff, Officer Winters looked into the shower through the bars and made jokes about Plaintiff's "nice behind" and about "what [Officer Winters] would like to do."  (Johnson Dep. 11:14-12:9.) Plaintiff responded by telling Officer Winters that he (Plaintiff) wanted to speak with a lieutenant and intended to file a grievance about the remarks.  (Pl.'s 56.1 ¶ 11.)  Officer Winters then escorted Plaintiff back to his cell, which Plaintiff did not share with any other inmates.  (Defs.' 56.1 ¶ 11; IDOC Adjustment Comm. Final Summ. Report #200901896 [55-7], Ex. G to Defs.' 56.1, at 2.) Defendants acknowledge that Plaintiff later complained that Officer Winters had made sexually suggestive remarks to him in the shower.  They deny that Officer Winters actually made these remarks, however, and deny that Plaintiff announced his intention to file a grievance.  (Defs.' Resp. to Pl.'s 56.1 [66], hereinafter "Defs.' Resp.", at ¶¶ 10-11; Winters Dep. [60-2], Ex. 5 to Buishas Aff., at 50:16-23.)

## II.    Alleged Assault in Plaintiff's Cell and the First Disciplinary Ticket

According to Plaintiff, approximately fifteen minutes after Officer Winters made remarks to him in the shower, Officer Winters approached him again.  Plaintiff testified that while he was sitting on top of his desk writing a grievance, Officer Winters returned to his cell, reached through the chuckhole of the cell to Plaintiff's desk—which was within reach of the chuckhole—and grabbed Plaintiff's buttocks.  (Johnson Dep. 15:23-18:14.)  Plaintiff asserts that he told Officer Winters that (1) he intended to report Officer Winters; and (2) that he wanted to talk to prison lieutenants or to "mental health" because he did not feel comfortable in Officer Winters's presence.  (Johnson Dep. 17:2-13.)  Plaintiff also used an intercom in his cell that directly connects to "main control," the division responsible for operating the prison surveillance system and responding to inmate calls,

to call for help and to report Officer Winters's actions. (Johnson Dep. 26:5-13; Pl.'s 56.1 ¶¶ 13-15.)

According to Plaintiff, Officer Winters left the area of Plaintiff's cell after Plaintiff used the intercom, but returned minutes later with a Subway sandwich. Plaintiff asserts that at some point during the fifteen minutes between when Officer Winters assaulted him through the chuckhole and when other officers appeared, Officer Winters offered him the sandwich in exchange for Plaintiff's agreeing to keep silent about the incident. Plaintiff testified that he refused the offer, and Officer Winters responded by issuing Plaintiff a disciplinary ticket. (Johnson Dep. 30:17-32:14; Pl.'s 56.1 ¶¶ 16-17.) That first disciplinary ticket from Officer Winters on September 7, 2009 (#200901897) cited Plaintiff for five violations at 5:12 p.m.: damage or misuse of property, intimidation or threats, dangerous communications, insolence, and contraband/unauthorized property. (Pl.'s 56.1 ¶ 17; IDOC Adjustment Comm. Final Summ. Report #200901897 [55-5], Ex. E to Defs.' 56.1, at 2.)

Defendants deny that Officer Winters grabbed Plaintiff's buttocks or offered Plaintiff a sandwich in return for his silence. (Defs.' Resp. ¶¶ 12, 16.) Officer Winters was assigned to work from 3:00 p.m. until 11:00 p.m. that day, and his duties included ensuring that all inmates in the unit received showers at the beginning of the shift and then, when dinner was served around 4:30 or 5:00 p.m., passing out and collecting the inmates' trays. (Winters Dep. 9:12-10:4, 11:21-12:21, 23:12-19, 33:5-34:8). According to Officer Winters, while he was collecting dinner trays on the day of the incident, he observed a latex glove in Plaintiff's cell. (*Id.* at 23:20-24:13.) Latex gloves are prohibited, Officer Winters testified, because inmates sometimes fill gloves with urine and throw them out of their cells. (*Id.*) Officer Winters asserts that he ordered Plaintiff to turn over the glove and warned Plaintiff that he would write Plaintiff a disciplinary ticket. (*Id.* at 24:8-9.) According to Officer Winters, Plaintiff did hand over the glove after initial resistance but began cursing at and threatening him. (*Id.* at 24:14-21.) Officer Winters testified that he ultimately issued a disciplinary ticket–not for possession of the glove, but for Plaintiff's having cursed at Officer Winters in response to his announcement that he intended to issue a ticket. (Winters Dep. at 31:17-33:4.) The relevant

ticket (#200901897) does list a contraband charge, however.  (Pl.'s 56.1 ¶ 17; IDOC Adjustment Comm. Final Summ. Report #200901897 at 2.)

At a hearing before the IDOC Adjustment Committee on September 21, 2009 to review disciplinary tickets that Defendants issued Plaintiff the night of the alleged assault,[1] inmate Earlton Murray testified in support of Plaintiff that Officer Winters had touched Plaintiff's buttocks.  (IDOC Adjustment Comm. Final Summ. Report #200901897 at 2.)  Another inmate, Bass (his first name is not in the record), had been discharged by that time, but the IDOC Adjustment Committee's report notes that Bass would have testified that Plaintiff did not curse at Officer Winters, that Plaintiff yelled because Officer Winters grabbed his buttocks, and that Officer Winters brought Plaintiff a Subway sandwich "so he would be quiet."  (*Id.*)  The Committee found Plaintiff guilty of insolence, but not guilty of the other four violations listed in the ticket, including contraband.  (*Id.*)

III.    **Assault Report and Search of Plaintiff's Cell**

After Plaintiff's intercom call to "main control" reporting that Officer Winters assaulted him, "main control" radioed Officer Winters regarding the allegations, and Officer Winters reported Plaintiff's assault accusation to his superior officer, Defendant Lieutenant Ross.  (Pl.'s 56.1 ¶¶ 18-19.)  Officer Winters evidently reported only the assault allegation; he acknowledges that he did not tell Lieutenant Ross about the glove or anything other than what "main control" told him, and claims not to remember "word for word" what Lieutenant Ross said in response.  (*Id.* ¶ 20; Winters Dep. 102:18-103:23, 106:2-107:6.)  Lieutenant Ross also does not recall whether Officer Winters mentioned a latex glove at that time, though he testified that he "kind of remember[s] some urine, but nothing specific."  (Ross Dep. 92:18-23.)  Officer Winters nevertheless contends that he "had to [have] mention[ed]" the latex glove to Lieutenants Ross and Michel, though the record is unclear

_____

[1]      The IDOC Adjustment Committee conducted a single hearing on September 21, 2009, to review all of the disciplinary tickets issued to Plaintiff that are relevant here.  (IDOC Adjustment Comm. Final Summ. Reports [55-5, 55-7–55-11], Exs. E, F-K to Defs.' 56.1.)

about when this might have occurred.  (Winters Dep. 93:2-8, 106:12-109:5.)

Lieutenants Ross and Michel searched Plaintiff's cell at approximately 7:00 p.m on September 7, 2009.  (Pl.'s 56.1 ¶ 21; Defs.' 56.1 ¶ 16.)  Plaintiff asserts that when Lieutenants Ross and Michel arrived, Plaintiff told them that he wanted to speak to a mental health professional, but they denied his request.  (Johnson Dep. 9:4-13.)  It is undisputed that Lieutenants Michel and Ross could not see whether Plaintiff was in possession of contraband from outside Plaintiff's cell.  (Pl.'s 56.1 ¶ 22.)  Plaintiff contends that Lieutenant Ross and Lieutenant Michel therefore had no reason for suspicion, but Lieutenant Michel asserts they did because someone (he could not recall who it was) had told him that Plaintiff had contraband in his cell.  (Defs.' Resp. ¶¶ 21, 23; Michel Dep. [60-2], Ex. 4 to Buishas Aff., at 30:14-21.)  During the search, Lieutenant Michel testified that he and Lieutenant Ross either brought Plaintiff outside the cell or secured him in the shower.  (Michel Dep. at 33:23-34-9.)

Plaintiff asserts that Lieutenant Ross and Lieutenant Michel damaged his personal property while searching his cell.  (Pl.'s 56.1 ¶ 24.)  Plaintiff's cell was located on the upper level of a two-story housing unit, with an open central gallery and a walkway for access to the upper-level cells. (Ross Dep. 67:19-68:16.) He claims that Lieutenants Ross and Michel threw his possessions out of the cell and onto the gallery floor below, destroying up to $500 worth of his books and magazines, as well as personal pictures and mail.  He also asserts that they ripped up a grievance form he was preparing and flushed his pictures down the toilet.  (Johnson Dep. 34:3-35:22.) According to Plaintiff, he then told Lieutenants Ross and Michel that he intended to file a grievance and that he believed the search was conducted in retaliation for his reporting that Officer Winters had assaulted him.  Plaintiff alleges that Lieutenant Michel replied that "he [Lieutenant Michel] did not care about the courts."  (Pl.'s 56.1 ¶¶ 25-26.)  For their part, Defendants deny destroying Plaintiff's property, deny that Plaintiff announced his intention to file a grievance, and deny making any statement of disregard for the courts.  (Defs.' Resp. ¶¶ 24-26.)

5

According to Defendants, Lieutenants Ross and Michel did find a toothpaste container filled with urine in Plaintiff's cell; Plaintiff denies this. (Pl.'s Resp. to Defs.' 56.1 [63] ¶ 16.) IDOC Administrative Directive 05.01.111(b)(1) provides that officers who conduct any search of a "living area" and discover contraband must create a Shakedown Record/Confiscated Contraband slip (DC 252), provide one copy of this form to the inmate, attach one copy to the disciplinary report, and attach three copies to the contraband. (Pl.'s 56.1 ¶ 34.) If no contraband is found during the search, Administrative Directive 05.01.111(b)(2) requires the employee to create a shakedown slip recording that no contraband was found and provide the inmate with a copy. (*Id.*) According to Plaintiff, Ross and Michel violated these rules by failing to generate a shakedown slip for their search. (*Id.* ¶ 35.) Plaintiff claims that they did not provide him with a copy of such a slip and did not attach a copy to his disciplinary ticket. (*Id.* ¶ 36.) No copy of a shakedown slip appears in the record, but Defendants deny Plaintiff's assertions. (Defs.' Resp. ¶¶ 35-37.) Lieutenant Michel testified that inmates receive a copy of the slip after the officer finishes his or her report, not immediately after a search. (Michel Dep. 31:23-32:14.) He also stated that, to the best of his knowledge, there was a copy of the shakedown slip for the search of Plaintiff's cell in the prison's files. (*Id.* at 43:3-6.)

## IV. Alleged Beating of Plaintiff and Second and Third Disciplinary Tickets

After searching Plaintiff's cell, Lieutenants Ross and Michel returned Plaintiff to his cell and asked him to place his hands through the cell's chuckhole so they could remove his handcuffs. (Pl.'s 56.1 ¶ 27.) Defendants allege that Plaintiff grabbed Lieutenant Ross's hand as he was being uncuffed; Plaintiff denies having grabbed any officer's hand. (Pl.'s Resp. to Defs.' 56.1 ¶ 16.) According to Plaintiff, Lieutenant Michel used an object Plaintiff could not identify to beat his arms and hands while they were still in the chuckhole, resulting in permanent damage to his left hand. (Pl.'s 56.1 ¶ 28; Johnson Dep. 39:1-42:9.) Plaintiff testified that the beating lasted approximately three minutes, and that it left his left hand bruised and scarred from handcuff marks. (Johnson

Dep. 38:22-24; 42:11-24.) He claims the ring finger on his left hand was dislocated during the beating. (*Id.* at 43:1-13.)

According to Plaintiff, he asked each of the Defendants for medical care following the alleged beating but he did not receive any care. He also asserts that several other inmates witnessed Lieutenant Michel attempting to force Plaintiff's hands back into the cell and Plaintiff yelling from pain. (Johnson Dep. 44:3-11; Pl.'s 56.1 ¶ 29.) Inmate Kawrun Ricks later testified at the IDOC Adjustment Committee hearing on September 21, 2009 that Plaintiff did not grab Lieutenant Michel's arm. (IDOC Adjustment Comm. Final Summ. Report #200901896 at 2.) Inmate Earlton Murray stated that Lieutenant Michel tried to force Plaintiff's arm back into his cell and that Plaintiff was "yelling due to being in pain." (*Id.*) The Committee also noted that inmate Bass, who had been discharged, would have testified that Lieutenant Michel was trying to push Plaintiff's arm inside the chuckhole had Bass been present. (*Id.*)

Defendants deny beating Plaintiff. (Defs.' Resp. ¶ 28.) Lieutenant Ross testified that officers at Stateville do not carry nightsticks or other weapons, and Lieutenant Michel stated that force is not necessary, and is not used, to remove an inmate's hands from a chuckhole. (Ross Dep. 80:22-81:12; Michel Dep. 19:6-21:19.) They assert that Plaintiff grabbed Lieutenant Michel's arm through the chuckhole when they attempted to remove his handcuffs. After returning Plaintiff to his cell, Lieutenant Michel issued Plaintiff disciplinary ticket #200901896 at 7:00 p.m. for assaulting staff and for possessing contraband/unauthorized property.[2] (IDOC Adjustment Comm. Final Summ. Report #200901896 at 2.) Lieutenant Ross also issued Plaintiff disciplinary ticket #200901895 for damage or misuse of property at 7:10 p.m. (IDOC Adjustment Comm. Final Summ. Report #200901895 [55-8], Ex. H to Defs.' 56.1, at 2.) At the September 21, 2009 IDOC

[2] The IDOC Adjustment Committee's report indicates that Lieutenant Michel wrote ticket #200901896 for incidents occurring at 7:00 **a.m.,** but this appears to be a mistake. (IDOC Adjustment Comm. Final Summ. Report #200901896 at 2.) The ticket itself lists the approximate time of the incidents as 7:00 p.m. (*Id.*)

Adjustment Committee hearing challenging those tickets, the Committee found Plaintiff guilty of both violations charged in the ticket that Lieutenant Michel issued (including the charge of assaulting an officer), but expunged Lieutenant Ross's ticket. (IDOC Adjustment Comm. Final Summ. Report #200901896 at 2; IDOC Adjustment Comm. Final Summ. Report #200901895 at 2.)

## V.    Fourth Disciplinary Ticket

At 8:55 p.m. on September 7, 2009, an IDOC officer named Jeffrey Reighter (badge # 9892) (not Defendant Robert Reighter) issued Plaintiff disciplinary ticket #200901898. (Defs.' 56.1 ¶ 18.) The ticket charged Plaintiff with damage or misuse of property, reporting that he had opened his chuckhole and stuffed paper into the lock. (IDOC Adjustment Comm. Final Summ. Report #200901898 [55-9], Ex. I to Defs.' 56.1, at 2-4.) The IDOC Adjustment Committee later found Plaintiff guilty of this charge. (*Id.* at 2.) Defendants have submitted an affidavit from Stateville's Legal Coordinator stating that Defendant Robert Reighter did not work at Stateville on September 7, 2009. (Haven Aff. [55-13], Ex. M to Defs.' 56.1, at 2.)

## VI.   Fifth and Sixth Disciplinary Tickets

Defendants issued Plaintiff yet another disciplinary ticket at 10:00 p.m. As Officer Winters walked through Plaintiff's housing unit toward a guard's office near the showers, he claims to have discovered Plaintiff in one of the showers with the water running. (Winters Dep. 62:8-69:3.) Plaintiff reportedly cursed at Officer Winters and tried to spit on him. (IDOC Adjustment Comm. Final Summ. Report #200901900 [55-10], Ex. J to Defs.' 56.1, at 2.) Officer Winters issued Plaintiff disciplinary ticket #200901900 for intimidation or threats, dangerous communications, and insolence.[3] (*Id.*) The IDOC Adjustment Committee later found Plaintiff guilty of insolence, but not guilty of the other two violations. (*Id.*) The parties agree that, after Officer Winters issued the

---

[3]    The IDOC Adjustment Committee's report indicates that Officer Winters issued ticket #200901900 at 10:00 **a.m.**, but this again appears to be a mistake, as both Plaintiff and Defendants agree that the incidents occurred around 10:00 p.m. (Pl.'s Resp. to Defs.' 56.1 ¶ 19.)

10:00 p.m. ticket, prison authorities transferred Officer Winters to a different housing unit to separate him from Plaintiff. (Defs.' Resp. ¶ 39; Winters Dep. 85:3-23.) Officer Winters testified that, after an altercation between an inmate and a guard, prison authorities usually move the inmate to the segregation unit, but that did not happen in this case because Plaintiff was already in the segregation unit. (Winters Dep. 91:12-92:18.)

Finally, at 10:35 p.m., Defendant Officer Christopher Gore issued Plaintiff disciplinary ticket #200901899 for assaulting an inmate by spitting at and striking him. (IDOC Adjustment Comm. Final Summ. Report #200901899 [55-11], Ex. K to Defs.' 56.1, at 2.) The IDOC Adjustment Committee later found Plaintiff guilty of this offense. (*Id.*)

## VII.    Subsequent Treatment of Plaintiff's Injuries and His Grievance

Plaintiff contends that he informed Lieutenants Ross and Michel that he needed medical treatment for his injuries on September 7, 2009 after they allegedly beat his arms and hands, but he was not given medical care. (Pl.'s 56.1 ¶ 31.) Defendants deny this. (Defs.' Resp. ¶¶ 31.) A medical examiner did see Plaintiff on September 10, 2009, and noted that Plaintiff told him, "I took the chuckhole hostage, and they closed the chuckhole on my hand and twisted it."[4] (Outpatient Progress Notes [60-3], Ex. 9 to Buishas Aff., at 1.) The medical examiner's report (which erroneously identifies the date of injury as September 8, not September 7) states that Plaintiff's left hand was "slightly swollen on top of [the] hand" and that Plaintiff told the doctor that his right hand was also swollen. (*Id.*) The report does not mention any evidence of other damage to either of Plaintiff's hands beyond swelling in Plaintiff's left hand.

IDOC transferred Plaintiff to Lawrence Correctional Center on September 15, 2009, and

---

[4]    The record for this examination is marked "STA NRC," for Stateville Northern Reception and Classification, where Plaintiff was housed at the time of the incidents in this action (Outpatient Progress Notes at 1; Ross Dep. 69:10-15), but the parties refer to this September 10, 2009 examination as having occurred at Pontiac Correctional Center rather than at Stateville. (Pl.'s Resp. to Defs.' 56.1 ¶ 24.)

then to Pontiac Correctional Center on September 24, 2009. (Pl.'s 56.1 ¶ 40.) On October 6, 2009, Plaintiff filed a grievance concerning the events of September 7 with IDOC's Administrative Review Board (ARB) pursuant to 20 Illinois Administrative Code § 504.870(a)(3)-(4). (Pl.'s 56.1 ¶ 41; Pl.'s Grievance [60-3], Ex. 13 to Buishas Aff., at 1.) The grievance Plaintiff filed accused Officer Winters of grabbing Plaintiff's buttocks through the chuckhole and claimed that Lieutenants Ross and Michel tried to intimidate Plaintiff by (1) searching his cell without a shakedown slip; (2) destroying his personal property; and (3) issuing groundless disciplinary tickets to extend his incarceration. (*Id.* at 1-2; Pl.'s 56.1 ¶¶ 42-43.) At his deposition, Plaintiff testified that he felt some trepidation about filing the grievance because of the possibility of retaliation, though he ultimately did decide to proceed with it. (Johnson Dep. 73:1-10.)

On January 26, 2010, the ARB responded to Plaintiff's grievance by stating that the "[a]llegations of staff misconduct are not substantiated" and recommending that Plaintiff's grievance be denied, with the exception of an unrelated disciplinary report. (ARB Response [60-3], Ex. 14 to Buishas Aff., at 1-2.) The ARB reviewed Plaintiff's and Defendants' accounts of the events and concluded that "[b]ased on a total review of all available information and a compliance check . . . this office is reasonably satisfied the offender committed the offenses and recommends the grievance be denied." (*Id.* at 3.)

More than nine months after the night of the alleged assault and injury to Plaintiff's hands, a doctor at Pontiac Correctional Center X-rayed Plaintiff's left hand.[5] (OneRadiology X-Ray Report [60-3], Ex. 9 to Buishas Aff., at 2.) A radiologist in Normal, Illinois who examined the X-ray film on

---

[5]     It is not clear when the X-rays were taken, but the record shows that on June 17, 2010, a doctor at Pontiac ordered that the X-rays be reviewed by a specialist. (OneRadiology X-Ray Report [60-3], Ex. 9 to Buishas Aff., at 2.) Plaintiff "denies that his hand did not require treatment" (Pl.'s Resp. To Defs.' 56.1 ¶ 24) and correctly notes that the medical report is silent on the issue of treatment. (OneRadiology X-Ray Report at 2.) Plaintiff also asserts that "the record from Pontiac does not indicate whether his hand was X-rayed" (Pl.'s Resp. to Defs.' 56.1 ¶ 24), but a plain reading of the medical report shows that it was.

June 18, 2010 concluded that there was "old trauma" to the ring finger of Plaintiff's left hand as shown by the finger's deformity and edema. (*Id.*) Specifically, the radiologist noted: "an osseous fragment radial and distal aspect of the proximal phalanx of the 4th finger [with] . . . mild overlying soft tissue swelling. The fragment is well corticated indicating the injury is chronic. No acute fracture or dislocation is seen." (*Id.*) The report was therefore consistent with Plaintiff's allegation that his left ring finger was injured when Lieutenants Ross and Michel allegedly beat his hands and arms, but no other evidence shows whether the "old trauma" to Plaintiff's left hand resulted from his encounter with Defendants on September 7, 2009. Defendants assert that any trauma to Plaintiff's left hand on September 7, 2009 was minimal, both because they deny beating Plaintiff and because the medical examiner's report from September 10, 2009 does not mention any evidence of damage to Plaintiff's hand beyond slight swelling and the X-ray report does not mention the need for additional treatment.[6]

On September 13, 2010, just over a year after the alleged events, Plaintiff filed a *pro se* complaint alleging violations of his constitutional rights pursuant to 42 U.S.C. § 1983. (Pl.'s Compl. [6] at 1.) This court denied Defendants' motion to dismiss on June 11, 2011. (Mem. Opinion and Order [28] at 11.) Through an attorney assigned by the court, Plaintiff then filed an amended complaint, adding state law claims. (Pl.'s Amended Compl. [31].) The court now considers the parties' cross-motions for summary judgment.

---

[6]     The court notes that Plaintiff was issued a disciplinary ticket (#200901899) for striking another inmate hours after Lieutenants Ross and Michel searched Plaintiff's cell. (IDOC Adjustment Comm. Final Summ. Report #200901899 [55-11], Ex. K to Defs.' 56.1, at 2.) The IDOC Adjustment Committee later found Plaintiff guilty of that offense. (*Id.*) The hand injury may have resulted from this assault of another inmate on September 7, 2009, or from some other incident that took place between that date and June 2010.

**DISCUSSION**

Plaintiff has alleged that Defendants violated his rights by sexually harassing and assaulting him, retaliating against him for protected speech, and using excessive force (Count I); failing to protect him from injury (Count II); conspiring to use excessive force (Count III); failing to provide medical attention (Count IV); and filing false disciplinary reports (Count V). In addition to those claims, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges state law claims of battery (Count VI) and intentional infliction of emotional distress (Count VII). Defendants deny the substantive claims and assert several affirmative defenses: (1) that they are protected from suit by qualified immunity; (2) that Plaintiff has not established their involvement with sufficient specificity to state a claim; (3) that Plaintiff has not exhausted his administrative remedies as required by the Prisoner Litigation Reform Act; and (4) that this court lacks subject matter jurisdiction over the state law claims under the doctrine of sovereign immunity.[7] Defendants seek summary judgment on all of Plaintiff's claims; Plaintiff seeks summary judgment only on the retaliation claim.

**I.     Summary Judgment Standard**

Summary judgment is proper if the moving party shows that there is no genuine dispute of material fact such that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(a)). A fact is material if it might affect the outcome of the suit under governing law, and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). In ruling on a motion for summary judgment, the court construes all facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Id.* When presented with cross-motions for summary judgment, the court "construe[s] all inferences in favor of the party against whom the motion under

_____

[7]     Because the court has already addressed the argument that Plaintiff failed to state a claim, it will not do so here. (Mem. Opinion and Order at 11.)

consideration is made." *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005) (quoting *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir.2001)).

## II.  Claims Arising under 42 U.S.C. § 1983

### A.  Claim of Harassment and Assault

Plaintiff's sexual harassment and assault allegations are directed at Defendant Officer Winters.  Defendants seek summary judgment on Plaintiff's sexual harassment and assault allegations, arguing that the evidence does not establish that Officer Winters made sexual remarks about Plaintiff's buttocks while he was showering or that Officer Winters grabbed Plaintiff's buttocks while he was in his cell.  In the prison context, the Eighth Amendment prohibition of cruel and unusual punishment forbids the "unnecessary and wanton infliction of pain" by prison authorities as well as punishments that are "totally without penological justification."  *Hope v. Pelzer*, 536 U.S. 730, 737 (2002) (internal quotations and citations omitted); *Whitman v. Nesic*, 368 F.3d 931, 934 (7th Cir. 2004).  "[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action," however.  *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (internal quotations and citations omitted).

As support for their summary judgment argument that they committed no Eighth Amendment violations, Defendants cite the Seventh Circuit's statement in *Dobbey v. Ill. Dept. of Corrections* that harassment is "not what comes to mind when one thinks of 'cruel and unusual' punishment." 574 F.3d 443, 446 (7th Cir. 2009).  In *Dobbey*, the Seventh Circuit weighed evidence that a correctional officer hung a noose in the "main control" room, which was visible to plaintiff and other inmates, swatted the noose to make it swing, and sat down "looking crazy with evil eyes."  *Id.* at 444.  The court noted that the line between harassment and cruel and unusual punishment is "fuzzy," but held that the officer's behavior was not a constitutional violation because it was not "a credible threat to kill, or to inflict any other physical injury."  *Id.* at 446.  The Seventh Circuit distinguished the facts of *Dobbey* from those in other cases with genuinely actionable harassment,

including *Irving v. Dormire*, 519 F.3d 441, 449-50 (8th Cir. 2008)—a case where an officer threatened to kill a prisoner, repeatedly offered a bounty for assaulting him, and gave another prisoner a razor blade to assault him—and *Burton v. Livingston*, 791 F.2d 97, 100-01 (8th Cir. 1986)—a case where an officer pointed a gun at a prisoner, cocked it, used a racial slur, and repeatedly threatened to kill the prisoner. *Id.*

Officer Winters's alleged actions in this case are not as severe as the death threats in *Irving* and *Burton*, but his conduct did target a specific individual. In contrast with the alleged facts here, the defendant guard in *Dobbey* engaged in more general harassment of a group of inmates. Plaintiff was alone when Officer Winters's alleged conduct occurred, and his alleged grabbing of Plaintiff's buttocks involves physical contact not present in *Dobbey*. Such actions go beyond a mere malevolent touch and serve no legitimate penological purpose.

Defendants also cite an Eighth Circuit case, *Berryhill v. Schriro*, for the argument that an isolated incident of touching is not an "objectively serious injury" that rises to the level of an Eighth Amendment violation. 137 F.3d 1073, 1076 (8th Cir. 1998). In *Berryhill*, two maintenance workers at a prison momentarily grabbed the plaintiff's buttocks before he pulled himself away. *Id.* at 1074-75. The court described the conduct as "inappropriate" but upheld the district court's grant of summary judgment for the defendants because the evidence did not indicate that the touching was sexual and because no actual physical or psychological injury resulted. *Id.* at 1076-77.

Unlike *Berryhill*, in this case Plaintiff claims Officer Winters's assault of him was accompanied by sexual comments, and there is evidence that Plaintiff promptly sought mental health attention. The Seventh Circuit held recently that "[a]n unwanted touching of a person's private parts, intended to humiliate the victim or gratify the assailant's sexual desires, can violate a prisoner's constitutional rights whether or not the force exerted by the assailant is significant." *Washington v. Hively*, 695 F.3d 641, 643 (7th Cir. 2012). The defendant prison guard in *Washington* fondled plaintiff's testicles and penis through plaintiff's clothing for five to seven

14

seconds, and then fondled his nude testicles during a strip search for another two to three seconds. *Id.* at 642. Reversing a grant of summary judgment for the guard, the Seventh Circuit explained that the Eighth Amendment's prohibition of cruel and unusual punishment excludes *de minimis* harm, but not *de minimis* physical force, and observed that sexual offenses may cause harm sufficient to support a claim. *Id.* at 643. Like the guard in *Washington*, Officer Winters allegedly grabbed Plaintiff in a sexual manner, and Plaintiff requested mental health attention in response. Therefore, because the parties dispute whether Officer Winters touched and made comments to Plaintiff in a sexual manner, Defendants' motion for summary judgment is denied with respect to the sexual harassment and assault claims.

**B.    Retaliation Against Protected Speech**

Plaintiff next asserts that Defendants retaliated against him to prevent him from filing a grievance against Officer Winters. Specifically, he alleges that Officer Winters, Lieutenant Ross, and Lieutenant Michel issued him false disciplinary tickets; Lieutenant Ross and Lieutenant Michel conducted an unjustified search of his cell that did not comply with administrative procedure, damaging his property in the process; Lieutenant Michel unjustifiably beat his arms and hands while they were in the chuckhole to be uncuffed; and Officer Winters, Lieutenant Ross, and Lieutenant Michel ignored his requests for physical and mental medical attention.

An act taken in retaliation for the exercise of a constitutionally protected right violates the Constitution. *DeWalt v. Carter*, 224 F.3d 607, 618 (7th Cir. 2000). Retaliation against a constitutionally protected act "is actionable under Section 1983 even if the act, when taken for different reasons, would have been proper." *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012) (internal quotations and citations omitted). To prevail on a retaliation claim, a prisoner must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the Defendants' decision to take the retaliatory action." *Bridges v.*

*Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009) (internal quotations and citations omitted). If Plaintiff presents evidence that creates a dispute of fact on these elements, Defendants may still be entitled to summary judgment, but only if it is undisputed that the complained-of action would have occurred even absent the protected activity. *See Mays v. Springhorn*, 719 F.3d 631, 634 (7th Cir. 2013), *citing Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011).

Defendants conceded that Plaintiff's grievance was protected speech. (Defs.' Resp. to Pl.'s Mot. for Part. Summ. J. [65] at 2.) Indeed, it is well-established that use of grievance processes in prison is protected First Amendment activity. *See Pearson v. Welborn*, 471 F.3d 732, 740 (7th Cir. 2006); *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005). The court concludes that Plaintiff's threats to proceed with a grievance are protected speech, as well. Noting that the First Amendment does not require that grievances take a specific form, the Seventh Circuit has declined to hold that a prisoner's oral complaints about prison conditions are not protected simply because they are not in writing. *Pearson*, 471 F.3d at 741.

Plaintiff contends that Defendants retaliated against him for his First Amendment speech by writing unfounded disciplinary tickets, destroying his property during the cell search, failing to write him a shakedown slip, and beating his arms and hands. These actions were likely to deter Plaintiff from filing a grievance, and he in fact did not file one until after being transferred out of Stateville. The fact that Plaintiff was not ultimately so intimidated that he declined to file a grievance at all does not defeat this claim. Defendants themselves have challenged Plaintiff's compliance with the administrative grievance process (an argument discussed below). Prison officials may not simultaneously argue that compliance with a grievance process is required before proceeding on a retaliation claim in court, and that the filing of a grievance on its face defeats a retaliation claim. Plaintiff has presented evidence sufficient to survive summary judgment on his retaliation claim. The court turns next to the question of which of the individual Defendants may be liable.

### 1.    Retaliation - Officer Winters

Prisoners can sufficiently state a claim of retaliation when they allege that a prison official issued baseless disciplinary tickets against them in retaliation for their use of the grievance process. *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005); *see also Hunter v. Dutton*, No. 06-CV-444, 2009 WL 650531, *1-2, 6 (S.D. Ill. Mar. 9, 2009) (prison officers' inconsistencies in the shakedown report of the cell of an inmate who had previously filed a grievance against the officers created triable issues of fact). Plaintiff claims that Officer Winters retaliated against him by issuing spurious disciplinary tickets, but Defendants argue that Plaintiff has not produced any evidence to support that claim.

When viewing the evidence in the light most favorable to Plaintiff, there is circumstantial evidence that Plaintiff's announced intention to use the grievance process and Officer Winters's tickets are not wholly unrelated. In the span of less than six hours, Officer Winters wrote Plaintiff two disciplinary tickets charging Plaintiff with eight infractions. The IDOC Adjustment Committee later found Plaintiff guilty of just two of those eight supposed infractions, deeming the rest of the charges unfounded. Overall, Defendants' explanations of the circumstances surrounding the disciplinary tickets are vague or inconsistent, and they do not necessarily rebut the showing of retaliatory motive. For the first ticket, for example, Officer Winters testified that he saw a banned latex glove in Plaintiff's cell—an offense for which the Illinois Administrative Code calls for written discipline, 20 ILL. ADMIN. CODE §§ 504.30(b), 504.tbl.A (2013) (requiring write-up of inmate in possession of "contraband or unauthorized property")—but Officer Winters does not appear to have mentioned the glove in a contemporaneous conversation with Lieutenant Ross, nor did Lieutenants Ross and Michel report finding a glove during their search of Plaintiff's cell later that evening.[8]

---

[8]    Lieutenant Michel did cite Plaintiff for contraband after allegedly discovering a toothpaste tube filled with urine, but that ticket makes no mention of a latex glove.

Officer Winters issued Plaintiff disciplinary tickets for infractions the IDOC Adjustment Committee later deemed unfounded under circumstances that, Plaintiff contends, suggest an effort to dissuade Plaintiff from reporting Officer Winters's sexual advance. For example, Officer Winters issued his first ticket almost immediately after Plaintiff alleges he rejected the sandwich bribe. The court agrees that disputes of fact about the reasoning behind and circumstances surrounding Officer Winters's disciplinary tickets preclude summary judgment in favor of Defendant Winters on the retaliation claim.

The dismissal by the IDOC reviewing board of several of Officer Winters's charges against Plaintiff does not, however, require the conclusion that Plaintiff is entitled to summary judgment in his own favor. IDOC officers are expected to prepare disciplinary reports promptly when they observe an offense, but the Illinois Administrative Code does not require them to be certain that the inmate is guilty of the offense reported. ILL. ADMIN. CODE tit. 20, § 504.30(b) (2013). Evidence at trial may establish that Officer Winters had a good-faith basis for each of the charges he recorded, even though several of them were ultimately deemed unsubstantiated. Both parties' motions for summary judgment on Plaintiff's claim that Defendant Winters retaliated against him are denied.

### 2.      Retaliation - Lieutenants Ross and Michel

Plaintiff claims that Defendants Ross and Michel also participated in retaliating against him by searching his cell and damaging his property. Defendants respond that the evidence is insufficient to establish that Lieutenants Ross or Michel intended to discourage Plaintiff from filing a grievance about Officer Winters's conduct. Defendants assert that Ross and Michel had a legitimate reason to search Plaintiff's cell: one of them had received a report that it contained contraband. Lieutenants Ross and Michel also dismiss the significance of Plaintiff's claims that he did not receive a shakedown slip documenting the search in accordance with IDOC policy, arguing that the disciplinary ticket that Lieutenant Michel issued is sufficient to document the search. Indeed, although IDOC's failure to provide Plaintiff with a copy of the shakedown slip, or to produce

18

it in discovery, is regrettable, the court notes that Lieutenants Ross and Michel are not Stateville record keepers.

Viewing the evidence in the light most favorable to Plaintiff, however, assertions by Lieutenants Ross and Michel that one of them knew Plaintiff possessed contraband do not negate the possibility that they performed the search in order to discourage Plaintiff from filing a grievance against Officer Winters. *Cf. Mays*, 719 at 633-34 (reversing a defense verdict in a case alleging unconstitutional strip searches of a prisoner, and observing that "[t]here may have been a valid penological reason for the search, yet it may not have been the reason or a reason; the reason may have been to humiliate the plaintiff.") Notably, the record is unclear on precisely when Lieutenant Ross and Lieutenant Michel learned about the alleged latex glove supposedly in Plaintiff's cell. Officer Winters himself was not sure whether the lieutenants knew about the glove before the shakedown, and the IDOC Adjustment Committee later found Plaintiff not guilty of Officer Winters's citation for contraband.

Plaintiff cites another district court case, *Goodman v. Snyder*, to support his retaliation claim. No. 00-C-0948, 2003 WL 715650, *1-2 (N.D. Ill. Feb. 27, 2003). In *Goodman*, ten days after the district court announced its intention to grant summary judgment for a prisoner on his claim of religious discrimination, prison officers searched plaintiff's cell three times in two days. During the second search, the defendant prison officials confiscated valuable personal property belonging to the plaintiff, and also allegedly tore up some of his legal documents. *Id.* Though the prison officials claimed they searched the plaintiff's cell a second time in response to a tip that the plaintiff had contraband, the court found a genuine issue of fact about the motivation for the search because the guard who ordered it could not recall (1) who provided the tip, (2) how this information was transmitted to him, or (3) the nature of the contraband plaintiff allegedly possessed. *Id.* at *6. In this case, Lieutenant Michel similarly testified that he could not recall who informed him about possible contraband in Plaintiff's cell or how the information was transmitted to him. *See also*

*Turley v. Conder*, No. 08-CV-377, 2012 WL 780893, *8 (S.D. Ill. Mar. 8, 2012) (proximity of inmate's grievances to search of his cell and a lack of clear reasoning for that search factored into the court's decision to deny summary judgment for the defendant prison personnel).

Plaintiff urges that a retaliatory motive can be inferred in this case from the suspicious timing between his reporting of Officer Winters's behavior and the shakedown performed by Lieutenants Ross and Michel. Suspicious timing may well support a retaliation claim. *See Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000) (citing *Harris v. Fleming*, 839 F.2d 1232, 1238 (7th Cir. 1998) (after inmate refused to settle his conditions-of-confinement case, he was fired from his prison job and transferred from his cell; his account of the timing was sufficient to defeat summary judgment on his retaliation claim)). Though "[s]uspicious timing alone rarely is sufficient to create a triable issue," *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (internal quotations and citations omitted), suspicious timing along with other evidence or circumstances may support an inference of retaliation. *Greene*, 660 F.3d at 980 (holding that the proximity of a prisoner's grievance to the issuing of a threadbare conduct report about him was sufficient to create a triable issue over whether the report was retaliatory).

In this case, Plaintiff's protected speech was followed within hours by several disciplinary tickets later deemed unfounded, as well as a cell shakedown. And Plaintiff relies on more than mere timing to support his retaliation claim: he produced supportive witnesses for his disciplinary hearings; he was found not guilty of several disciplinary infractions; he testified that he never received a shakedown slip; he produced medical and prison transfer records to substantiate his claims; and he elicited an admission from Defendants that prison authorities transferred Officer Winters out of his housing unit as a result of their altercations. When these factors are considered together with the timing, a reasonable jury could infer retaliation by Lieutenants Ross and Michel.

Though the court concludes that Defendants are not entitled to summary judgment, when viewing the evidence in the light favorable to them (as the court must, on Plaintiff's motion), it is

clear that Plaintiff is not entitled to summary judgment, either. Plaintiff contends that the destruction of his personal property, the beating of his arms and hands, and the unfounded disciplinary tickets resulting from the shakedown by Lieutenants Ross and Michel all establish a retaliatory motive as a matter of law. The court disagrees. The Illinois Administrative Code provides that "[a]ll committed persons and their clothing, property, housing and work assignments are subject to search at any time." 20 ILL. ADMIN. CODE § 501.220(b)(1) (2013). Contraband need not be visible from outside a prisoner's cell in order to justify a search; indeed, contraband is ordinarily hidden. Nor does the paucity of evidence in the record supporting Defendants' assertion that Lieutenants Ross and Michel received a tip that Plaintiff had a contraband latex glove establish Plaintiff's right to summary judgment on his retaliation claim. Though failure to complete a shakedown slip violates IDOC administrative directives and the Illinois Administrative Code, even if Defendants did violate these regulations, mere administrative violations do not rise to the level of a constitutional violation. *See Thompson v. City of Chicago*, 472 F.3d 444, 454-55 (7th Cir. 2006) (noting that a police officer's non-compliance with departmental orders regarding force was irrelevant to whether the force he used was objectively reasonable because "violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established."); *Caruth v. Pinkney*, 683 F.2d 1044, 1052 (7th Cir. 1982) (holding that though the delay of a prisoner's disciplinary hearing beyond the administratively-required 72 hours was "relevant to the issue of pretextual punishment," it was not, by itself, "a [due process] violation of constitutional magnitude").

Plaintiff has presented a narrative of events from which a reasonable jury could infer retaliation and that Lieutenant Michel beat Plaintiff, but a reasonable jury also could find against Plaintiff based on the evidence. The credibility of the witnesses to Plaintiff's alleged beating is a question for the trier of fact, and judgment as a matter of law cannot be granted on an issue that requires the court to weigh witness credibility. *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir.

2009). Defendants' motion for summary judgment is denied with respect to the retaliation claim, and Plaintiff's motion for partial summary judgment on that claim is also denied.

### C. Excessive Force (Count I)

Plaintiff's excessive force claim focuses on Lieutenant Ross's and Michel's conduct while removing his handcuffs after the search of his cell, which resulted in an alleged injury to Plaintiff's hands. Defendants argue that because Plaintiff later admitted to a medical examiner that he "took the chuckhole hostage" while Lieutenants Ross and Michel were uncuffing his hands, any use of force by Defendants was justified. (*See* Outpatient Progress Notes at 1.) They also urge that the alleged injuries were so minor (the medical examiner who saw Plaintiff three days later did not note any treatments) that they would not violate Plaintiff's constitutional rights.

The core question for an excessive force claim under the Eighth Amendment is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). Several factors are relevant to this determination, including "the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate." *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004) (citing *DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 1999)). While significant injury is not required, a claim of excessive force must be predicated on more than the *de minimis* use of force. *DeWalt*, 224 F.3d at 620. The use of force must be "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10 (internal quotations and citations omitted). To survive summary judgment, a prisoner must produce evidence to support "a reliable inference of wantonness in the infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

While Plaintiff's account of his alleged beating may support his claim of retaliation, whether it also supports an independent excessive force claim is a much closer question. Lieutenant Michel testified that force is not necessary and is not used to remove an inmate's hands from a chuckhole.

Plaintiff himself identified his own conduct as the reason for any struggle over the chuckhole when he told the medical examiner who saw him on September 10, 2009 that the incident occurred because Plaintiff "took the chuckhole hostage." (Outpatient Progress Notes at 1.) The IDOC Adjustment Committee also later found Plaintiff guilty of grabbing Lieutenant Michel's arm, a finding that is binding on Plaintiff due to *Heck v. Humphrey*, 512 U.S. 477 (1994). Moreover, the medical examination of Plaintiff's hand three days after the incident showed only "slight swelling" of his left hand; an X-ray of his hand months later showed only "old trauma" of uncertain origin. (*See* OneRadiology X-Ray Report at 2.)

Several Seventh Circuit cases support Defendants' arguments that they are entitled to summary judgment on Plaintiff's excessive force claim. In *Outlaw v. Newkirk*, a defendant prison guard had closed the cuffport door on the plaintiff prisoner's hands to stop the prisoner from throwing garbage through the door, causing "slight swelling" to the prisoner's hands. 259 F.3d 833, 839 (7th Cir. 2001). The court reasoned that a jury could only conclude that the incident was an accident or that the guard "deliberately and perhaps unnecessarily applied a relatively minor amount of force to achieve a legitimate security objective," which falls short of the "repugnant to the conscience of mankind" standard. *Id.* More recently, in *Guitron v. Paul,* when a prisoner refused a guard's orders to move out of other inmates' way in a hallway, the guard bent the plaintiff's wrist with modest force, and after the plaintiff continued to disobey, the guard applied full force, leading to "swelling and two months of pain." 675 F.3d 1044, 1045-46 (7th Cir. 2012). The Seventh Circuit nevertheless affirmed the district court's dismissal of the prisoner's complaint, holding that the officer's additional force did not violate the Eighth Amendment because prison officials' actions that may seem retrospectively unreasonable are not constitutional violations if they were carried out in the good-faith pursuit of prison security measures. *Id.*

As Plaintiff notes, the Supreme Court held in *Hudson* that excessive force may violate the Constitution even where a prisoner does not suffer serious injury. *Hudson*, 503 U.S. at 4. The Fifth

Circuit had ruled in favor of prison officials on the ground the prisoner's injuries were "minor," but the Supreme Court disagreed, noting that "the blows directed at [the inmate] . . . caused bruises, swelling, loosened teeth, and a cracked dental plate . . . ." *Id.* at 10. In this case, however, the court concludes that whether Lieutenant Michel's response to Plaintiff's conduct was excessive is not a jury question. Plaintiff does not link evidence of his alleged injuries to Lieutenant Michel's treatment of him in a way that raises his excessive force claim beyond the realm of speculation. Like the plaintiffs in *Outlaw* and *Guitron*, Plaintiff subverted Lieutenant Michel's authority by grabbing Lieutenant Michel's arm before Lieutenant Michel finished removing the handcuffs from Plaintiff. Lieutenant Michel's response served legitimate security objectives—removing handcuffs from an inmate and preventing the inmate from pulling the handcuffs back into his cell—and is not "repugnant to the conscience of mankind," even if in retrospect he used more force than was strictly necessary. The court concludes that Defendants are entitled to summary judgment on the excessive force claim.

### D. Conspiracy to use Excessive Force (Count III)

Defendants also seek summary judgment on Plaintiff's conspiracy claim. To establish conspiracy, Plaintiff must show that: "(1) a state official and a private individual(s) reached an understanding to deprive the plaintiff of [the plaintiff's] constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012) (quoting *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007)). A plaintiff must produce more than a "bare allegation" or "mere suspicion" to succeed on a conspiracy claim. *Cooney v. Rossiter*, 583 F.3d 967, 970-71 (7th Cir. 2009). The plaintiff must instead identify "the parties, the general purpose, and the approximate date of the conspiracy." *Loubser v. Thacker*, 440 F.3d 439, 443 (7th Cir. 2006).

Regardless of whether Lieutenant Michel planned to beat Plaintiff's hands, responded to a threat posed by Plaintiff grabbing his arm, or never touched Plaintiff at all, the evidence shows

no indication of an agreement between Lieutenants Ross and Michel to use excessive force. Defendants' motion for summary judgment is granted with respect to the conspiracy to use excessive force claim.

### E.    Failure to Protect (Count II)

Defendants next argue that Plaintiff has not shown that they failed to protect him from injury in violation of the Eighth Amendment.  To succeed on a claim against prison officials for failure to protect, an inmate must establish: "(1) that he was incarcerated under conditions posing a substantial risk of serious harm and (2) that the defendants acted with deliberate indifference to his health or safety."  *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010) (internal quotations and citations omitted).  Prison officials incur liability for breach of this duty when they are "aware of a substantial risk of serious injury to [an inmate] but nevertheless fail[] to take appropriate steps to protect him from a known danger."  *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 669 (7th Cir. 2012) (internal quotations and citations omitted).  Such a claim is generally asserted in circumstances involving injury at the hands of fellow inmates, not guards.  *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  The plaintiff bears the burden of establishing that prison officials acted with deliberate indifference to the inmate's risk of harm.  *Pinkston v. Madry*, 440 F.3d 879, 889 (7th Cir. 2006).  "Mere negligence or inadvertence" is insufficient; plaintiff must present evidence that defendants knew there was a "strong likelihood rather than a mere possibility" that violence would occur.  *Id.* (internal quotations and citations omitted).

Plaintiff has not established that the conditions of his incarceration posed a substantial risk of harm, nor has he shown that any of the other Defendants were aware of and failed to take steps against Lieutenant Michel's alleged beating of his hands.  Defendants' motion for summary judgment is granted with respect to the failure to protect claim.

**F.      Failure to Provide Medical Attention (Count IV)**

In Count IV, Plaintiff alleges that Defendants ignored his requests for medical attention.  The Eighth Amendment's prohibition against cruel and unusual punishment requires that prison officials provide medical care to their inmates.  *Estelle v. Gamble*, 429 U.S. 97, 103 (1975); *Duckworth v. Ahmad*, 532 F.3d 675, 678 (7th Cir. 2008).  A prison official's "'deliberate indifference to serious medical needs of prisoners'" violates the Eighth Amendment.  *Munson v. Gaetz*, 673 F.3d 630, 637 (7th Cir. 2012) (quoting *Estelle*, 429 U.S. at 104).

To succeed on a deliberate indifference claim, a plaintiff must show that he suffers from an objectively serious medical condition to which a prison official "was deliberately, that is subjectively, indifferent."  *Duckworth*, 532 F.3d at 679.  An objectively serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal quotations omitted).  Although a prisoner need not establish that prison officials intended to harm him, a showing of negligence, or even gross negligence, is insufficient.  *Id.*  Deliberate indifference requires a showing that the defendant prison official "knows of and disregards an excessive risk to inmate health or safety" or is "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and proceeds to draw this inference.  *Farmer*, 511 U.S. at 837.

For purposes of analysis, the court will assume that Plaintiff's hand injury constituted a serious medical condition.[9]  With respect to whether officials ignored the condition or unreasonably delayed in seeking treatment, the "length of delay that is tolerable depends on the seriousness of

---

[9]      Plaintiff has not argued, or presented evidence, that the old fracture observed months later was traceable to the incidents in this case, but a bone fracture may well qualify as a serious medical condition.  *See Roe v. Elyea*, 631 F.3d 843, 861-62 (7th Cir. 2011) (noting conditions such as a broken wrist, tooth decay, a dislocated finger, a hernia, arthritis, heartburn and vomiting, and minor burns sustained from lying in vomit may be objectively serious).

the condition and the ease of providing treatment." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (internal quotations and citations omitted). "Even a few days' delay in addressing a severely painful but readily treatable condition suffices to state a claim of deliberate indifference." *Id.*; *compare Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008) (overturning a grant of summary judgment for prison guards where the treatment of an inmate's painfully broken nose was delayed for a day and a half) *with Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (prisoner's six-day wait for treatment of an infected cyst did not constitute deliberate indifference where the physician had found no infection one week earlier).

In this case, Plaintiff's hand was examined just three days after the alleged injury. At that time, the Stateville medical examiner recorded only slight swelling in Plaintiff's left hand. Notably, the record here also does not reveal which of the Defendants were aware of Plaintiff's injuries or whether any of them were aware that they may have been serious. In short, there is no evidence that Defendants were both aware that Plaintiff suffered from a serious medical condition and delayed unreasonably in seeking treatment for him. Defendants are entitled to summary judgment on this claim.

### G.     False Disciplinary Reports (Count V)

In Count V, Plaintiff alleges that the disciplinary tickets Defendants issued him on September 7, 2009 were false. Defendants denied this claim in their answer and asserted that the six disciplinary tickets issued between approximately 5:12 p.m. and 10:35 p.m. all stemmed from Plaintiff's violation of IDOC rules.[10] (Defs.' Answer [33] ¶¶ 44-46.) Ultimately, the IDOC Adjustment Committee found Plaintiff guilty of some of the charges and dismissed others. Under the relevant case law, however, allegations that prison officials issued false or unfounded disciplinary reports

---

[10]     See Appendix A for a full list of Plaintiff's tickets and their citations. Officer Winters cited Plaintiff for eight of the thirteen individual violations identified in the six tickets.

are analyzed as claims of retaliation. Such allegations do not support an independent claim under 42 U.S.C. § 1983, and Defendants' motion for summary judgment on Count V is therefore granted.

## III.    Illinois State Law Claims

In addition to his federal claims, Plaintiff has asserted state law claims of battery (Count VI) and intentional infliction of emotional distress (Count VII). Defendants argue they are immune from these claims under relevant Illinois immunities law. *See Omosegbon v. Wells*, 335 F.3d 668, 673 (7th Cir. 2003) (state rules of immunity are binding in federal court for state causes of action).

Illinois has waived sovereign immunity in limited circumstances. 745 ILL. COMP. STAT. 5/1 (2012). The Court of Claims has exclusive jurisdiction over all claims against the State of Illinois for tort damages. 705 ILL. COMP. STAT. 505/8(d) (2012). Though state officials may be personally liable for violations of a plaintiff's rights, immunity bars the action if the claim is against the State of Illinois itself. *Healy v. Vaupel*, 133 Ill. 2d 295, 308, 549 N.E.2d 1240, 1247 (1990).

Whether an action is against the State or individual actors hinges on the issues involved and the relief sought. *Jinkins v. Lee*, 209 Ill. 2d 320, 330, 807 N.E.2d 411, 417 (2004). An action is against the State, and thus barred by the doctrine of sovereign immunity, when: "(1) [there are] no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State." *Id.* (internal quotations and citations omitted).

Defendants argue that they acted solely within their duties as state employees in this case, not on their own as individuals. The court agrees. As Defendants note, any duty to protect inmates arises solely from their employment at IDOC, and the normal functions of IDOC employees include protecting inmates from bodily harm. *See Brooks v. Lieutenant Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (noting that state law claims are not dependent on constitutional claims and holding that

plaintiff's malicious prosecution claim was barred by sovereign immunity because plaintiff did not allege conduct that exceeded the defendant state officials' authority); *Richman v. Sheahan*, 270 F.3d 430, 442 (7th Cir. 2001) ("[I]f there are no allegations that the defendant was acting for a purpose unrelated to his employment, the fact that the conduct was wilful and wanton does not take the conduct outside the defendant's scope of agency for purposes of sovereign immunity.").

Plaintiff urges, in response, that the Defendants' alleged acts of battery and intentional infliction of emotional distress do exceed their authority as IDOC employees, and that Defendants owed a duty to him that was independent of his status as a prisoner. As support, he cites *Whitlock v. Brueggemann,* where the Seventh Circuit held that Illinois state police officers were not shielded from liability for claims that they concealed evidence because such conduct was not within their duties as police officers. 682 F.3d 567, 590 (7th Cir. 2012). Unlike the extraordinary conduct in *Whitlock*, however, the actions that form the basis of Plaintiff's state law claims—cell shakedowns, writing disciplinary tickets, and occasional physical force—all fall within a prison guard's normal and official functions. Sovereign immunity bars Plaintiff's state law claims of battery and intentional infliction of emotional distress, so the court grants Defendants' motion for summary judgment on those claims.

## IV.    Affirmative Defenses

Finally, the court turns to Defendants' affirmative defenses: that they acted in good faith and are therefore shielded by qualified immunity; and that Plaintiff has not exhausted his administrative remedies as required by the Prisoner Litigation Reform.[11] Qualified immunity is not available here because fact disputes preclude summary judgment on certain of Plaintiff's constitutional claims and the rights Plaintiff seeks to vindicate were clearly established. With respect to the requirement that

---

[11]    Defendants also claim that Plaintiff has not established their involvement with sufficient specificity to state a claim and that sovereign immunity bars Plaintiff's state law claims, but the court has already addressed the sufficiency of Plaintiff's allegations and the matter of sovereign immunity under Illinois law.

Plaintiff exhaust his administrative remedies, the record shows that Plaintiff did file a grievance, and the Review Board's final decision on that grievance makes no mention of any further appeal process he should have followed. The affirmative defenses therefore do not provide a basis for judgment in Defendants' favor at this stage.

## V.  Defendant Reighter

Defendants note that Plaintiff has named Stateville employee Robert Reighter as a Defendant, but Robert Reighter did not work at Stateville on September 7, 2009. Plaintiff does not dispute this. (Pl.'s Resp. to Defs.' 56.1 ¶ 5.) Plaintiff appears to have mistaken Robert Reighter for fellow Stateville employee Jeffrey Reighter, who wrote Plaintiff a ticket that day. Any claims against Jeffrey Reighter are now barred by the statute of limitations. The court enters summary judgment in favor of Defendant Robert Reighter on all claims.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [53] is granted with respect to the claims of excessive force, conspiracy to use excessive force, failure to protect, failure to provide medical attention, filing of false disciplinary reports, state law battery, and state law intentional infliction of emotional distress. Defendants' motion for summary judgment is denied with respect to the alleged sexual harassment and assault, and the claim of retaliation against protected speech. Summary judgment is granted on all claims for Defendant Robert Reighter only. Plaintiff's motion for partial summary judgment on the retaliation against protected speech claim [57] is denied.

ENTER:

Dated:  August 8, 2013

REBECCA R. PALLMEYER
United States District Judge

<u>**Appendix A**</u>

**Plaintiff's Disciplinary Tickets on September 7, 2009**

<u>Officer Winters – 5:12 pm, #200901897</u>

1. Damage or Misuse of Property: Not Guilty
2. Intimidation or Threats: Not Guilty
3. Dangerous Communications: Not Guilty
4. Insolence: Guilty
5. Contraband/Unauthorized Property: Not Guilty

<u>Lieutenant Michel – 7:00 pm, #200901896</u>

1. Assaulting any Person – Staff: Guilty
2. Contraband/Unauthorized Property: Guilty

<u>Lieutenant Ross – 7:10 pm, #200901895</u>

1. Damage or Misuse of Property: Expunged

<u>Officer Reighter – 8:55 pm, #200901898</u>

1. Damage or Misuse of Property: Guilty

<u>Officer Winters – 10:00 pm, #200901900</u>

1. Intimidation or Threats: Not Guilty
2. Dangerous Communications: Not Guilty
3. Insolence: Guilty

<u>Officer Gore – 10:35 pm, #200901899</u>

1. Assaulting any Person – Inmate: Guilty